UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON, SYNDICATE NOS. 2003, 1414, 0510, 4472, 1183, 1200, AND 4444, SUBSCRIBING TO POLICY NUMBER NJL440003612, | § § § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:16-CV-0465-B |
| LOWEN VALLEY VIEW, LLC and PANADE II LTD. d/b/a HILTON GARDEN INN, | § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Certain Underwriters at Lloyd's of London, Syndicate Nos. 2003, 1414, 0510, 4472, 1183, 1200, and 4444, Subscribing to Policy Number NJL440003612's (Plaintiff or Underwriters) Amended Motion for Summary Judgment. Doc. 46. For the reasons explained below, Plaintiff's Motion is **GRANTED**.

I.

BACKGROUND

A.    *Factual History*[1]

This is an insurance coverage dispute involving hail damage to a hotel. Defendants Lowen

---

[1] This factual history is drawn from the parties' summary judgment briefing and evidence, as well as their pleadings. Any disputed fact is noted as the contention of a particular party.

- 1 -

Valley View, LLC and Panade II Ltd. d/b/a Hilton Garden Inn (collectively Defendants) own and operate the Hilton Garden Inn in Irving, Texas. Doc. 34, Defs.' Resp. to Pl.'s Mot. Summ. J. 4 [hereinafter Defs.' Resp.]. Underwriters issued a standard commercial property insurance policy (the Policy) to Defendants covering the hotel for the period from June 2, 2012, to June 2, 2013. Doc. 47, Pl.'s Br. in Supp. of Am. Mot. Summ. J. 2 [hereinafter Pl.'s Br.]. The Policy, by its terms, covered "direct physical loss or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." *Id.* (referencing Doc. 48, Pl.'s App. in Supp. of Am. Mot. Summ. J. [hereinafter Pl.'s App.] 133, Ex. D, Building and Personal Property Coverage Form). The parties do not dispute that hail was a covered cause of loss under the Policy. *See* Doc. 11, Defs.' Answer & Countercls. ¶ 26; *see also* Doc. 47, Pl.'s Br. 11.

In November 2014, Ajay Desai, the vice president of the company that manages the hotel, was evaluating the property for potential capital improvement projects. Doc. 34, Defs.' Resp. 5. Noticing that "the shingles on the top of the hotel looked bad," Desai contacted a roofing contractor, who inspected the property and found evidence of significant hail damage to the various roofing systems at the property. *Id.* On December 22, 2014, this roofing contractor obtained a weather history report from a company called Weather Fusion/Point Data, which noted several hail events at or near the hotel between the dates of January 1, 2006, and December 21, 2014. *Id.* (citing Doc. 48, Pl.'s App. 209–11, Ex. G, Weather Fusion/PointData Report).[2]

Specifically, the report, dated December 22, 2014, noted nine events of hail "at location"

---

[2]There does not appear to be any significance to the beginning date of the roofer's search, January 1, 2006. And the only significance of December 21, 2014, appears to be that it was the day before the report was requested.

between January 1, 2006, and December 21, 2014, five of which had "estimated maximum hail size" of greater than one inch. *See* Doc. 48, Pl.'s App. 209–11, Ex. G, Weather Fusion/Point Data Report. Of the nine hail events noted "at location," seven occurred before the policy period, one after, and one during, on June 13, 2012. *See id.* The event with the largest "estimated maximum hail size" noted "at location" was on May 24, 2011. *See id.* And of the five events with "estimated maximum hail size" greater than one inch, only the June 13, 2012 event occurred during the policy period; the other four occurred prior to the policy period. *See id.*

Defendants' roofing contractor provided a copy of the Weather Fusion/PointData report to Desai, who in turn provided a copy to Defendants' insurance agent on December 29, 2014. Doc. 34, Defs.' Resp. 5; Doc. 47, Pl.'s Br. 3. Defendants' insurance agent filed a hail claim with Underwriters on behalf of Defendants on the same day. Doc. 34, Defs.' Resp. 5; Doc. 47, Pl.'s Br. 3. The description of the damage provided to Underwriters was "roof damage due to hail," and the date of loss listed on the Property Loss Notice was June 13, 2012, the date of the only hail event noted on the Weather Fusion/PointData report provided to the insurance agent that occurred during the policy period. Doc. 48, Pl.'s App. 204–05, Ex. E, Property Loss Notice.

After receiving notice of the claim from the agent, Underwriters assigned the investigation of the claim to Frontier Adjusters, which sent an independent adjuster, Derek Phipps, to inspect the property for hail damage in mid-January 2015. Doc. 34, Defs.' Resp. 5; Doc. 47, Pl.'s Br. 4; Doc. 48, Pl.'s App. 231–38, Ex. J, Phipps Damage Estimate.[3] When assigned the job, Phipps received only the

---

[3]Though it does not appear to be a point of contention between the parties, there is some confusion as to the actual date of Phipps's inspection. Plaintiff indicates the inspection took place on January 12, 2015. Doc. 47, Pl.'s Br. 4. Defendants state it took place on January 16, 2015. Doc. 34, Defs.' Resp. 5. Phipps's actual report provides a "Date Inspected" of January 14, 2015. Doc. 48, Pl.'s App. 232. For what it's worth,

Property Loss Notice, which included no information about the Policy or its coverage and no special instructions for the inspection. Doc. 48, Pl.'s App. 205, Ex. E, Property Loss Notice; Doc. 33, Defs.' App. in Supp. of Resp. to Pl.'s Am. Mot. Summ. J. [hereinafter Defs.' App.] 52–55, Ex. D, Dep. of Derek Phipps.

Before physically inspecting the property, Phipps consulted National Oceanic and Atmospheric Administration (NOAA) reports online, which he used to confirm that a hail storm had in fact occurred in the area and on the date of loss provided to him by Frontier Adjusters. Doc. 33, Defs.' App. 65–66, Ex. D, Dep. of Derek Phipps. Phipps's computer log notes from January 16, 2015, indicate that he found significant hail damage to the roofs and exterior siding upon inspection of the property. *Id.* at 412, Ex. K, Phipps Computer Log Notes. Phipps determined that the roofs would require replacement rather than repair, and on January 19, 2015, prepared an estimate of what it would cost to replace the roofs. Doc. 48, Pl.'s App. 231–38, Ex. J, Phipps Damage Estimate.[4]

---

Phipps's affidavit indicates he inspected the property on January 12, 2015. Doc. 48, Pl.'s App. 214, Ex. H, Aff. of Derek Phipps ¶ 6. Suffice it to say his investigation took place in mid-January.

[4]From the evidence it appears that Phipps's Damage Estimate includes only the cost to replace the roofs, not the cost to repair the damage to the exterior siding. Apparently, Phipps was waiting to hear back from other contractors before submitting an estimate for the siding, but it does not appear that he ever heard back from the contractors or submitted an updated estimate. *See* Doc. 33, Defs.' App. 412, Ex. K, Phipps Computer Log Notes (entry from Jan. 16, 2015, stating "The exterior EIFS has hail damage on each elevation requiring repairs and bids from two local stucco/eifs contractors . . . . IA is coordinating with contractor and owner/insured to obtain the exterior bids."); *id.* at 150, Ex. E, Phipps Damage Estimate (noting that certain work referenced in the estimate was to be "performed by the roofing contractor" and thus would not be "included in the exterior EIFS repair bid amount"); *id.* at 71, Ex. D, Dep. of Derek Phipps ("A: So before I made a recommendation, I just requested that a stucco/EIFS professional give their recommendation for it . . . ."); *id.* at 82 ("Q: . . . just so I'm clear on this, this estimate that you prepared is the hail damage that you saw at the Hilton Garden Inn to the three roof systems? A: Correct."); *id.* at 86 ("Q: Okay. And did you ever get a copy of the EIFS damage estimate from the contractor? A: I did not. Q: Do you recall sending any subsequent reports to either Frontier or their carrier after your initial report on January 19th of 2015? A: I do not.").

Phipps submitted his estimate to Frontier Adjusters through a web-based computer program. Doc. 33, Defs.' App. 73, Ex. D, Dep. of Derek Phipps.

On March 2, 2015, Underwriters—through an authorized claims administrator, Peninsula Insurance Bureau—sent a "reservation of rights" letter to Defendants, which indicated that the initial investigation had revealed "potential coverage issues," namely "late reporting of the loss." *Id.* at 239–42, Ex. K, Reservation of Rights Letter. Therefore, the letter stated, the investigation would proceed "under a full reservation of rights." *Id.* It also directed Defendants to the specific policy language requiring "prompt notice of the loss or damage." *Id.* (quoting Doc. 48, Pl.'s App. 35, Building and Personal Property Coverage Form, Part E.3.a.2). Finally, the letter noted that "any recommendations made by the adjuster [were] subject to the Underwriters' review and approval." *Id.* at 242.

Subsequently, Underwriters—through Frontier Adjusters—engaged a company called Haag Engineering to "determine the extent of hailstone impact damage to the roofing and siding" and to "evaluate when hail damage might have occurred." Doc. 33, Defs.' App. 243, Ex. G, Haag Report No. 1. Haag's first report, dated April 8, 2015, noted that "[a] date of June 13, 2012 was provided with our assignment." *Id.* at 244. After inspecting the property on March 17, 2015, and consulting weather history reports from the National Climatic Data Center, CoreLogic (formerly Weather Fusion, the same company that provided the initial weather history reports to Defendants' roofing contractor), and NOAA, Haag concluded that "the most *recent* hailstorm with hailstones large enough to cause the damage we observed was on June 13, 2012." *Id.* at 250 (emphasis added). Notably, the CoreLogic report attached to Haag's report contained the same history of hail events

found in the Weather Fusion/PointData report provided to Desai and Defendants' insurance agent prior to the filing of the claim. *Compare* Doc. 48, Pl.'s App. 209–11, Ex. G, Weather Fusion/PointData Report (provided to Desai and insurance agent), *with* Doc. 33, Defs.' App. 263–64, Ex. G, Haag Report No. 1 (CoreLogic report attached to Haag Report No. 1).

A second report from Haag Engineering, ordered specifically to "discuss the likelihood that damage occurred between December 29, 2012 and December 29, 2014," again noted that Haag had "no reason to believe the dents occurred more *recently* than the June 13, 2012 date given." *Id.* at 363–64, Ex. H, Haag Report No. 2 (emphasis added). This report also for the first time identified "June 13, 2012 as the most *likely* date damage occurred." *Id.* at 363 (emphasis added). As discussed below, Defendants place much weight on this slight change in wording.

In December 2015, Underwriters requested an Examination Under Oath of Ajay Desai, vice president of the hotel's property management company. Doc. 34, Defs.' Resp. 8. The Examination took place in January 2016. There, Desai described how he first noticed the condition of the roofs in November 2014 and how he sent the Weather Fusion/PointData report to the insurance agent, who Desai suspected then chose the date of loss to report to the insurer. *See generally* Doc. 33, Defs.' App. Ex. C, Exam. Under Oath of Ajay Desai; *see also* Doc. 48, Pl.'s App. 208, Ex. F, Exam. Under Oath of Ajay Desai ("I think they looked at the history and they probably saw which period had the highest amount of hail and -- I assume that's how they determined where to file the claim.").

A month later, on February 18, 2016, Underwriters denied Defendants' claim "based on [Defendants'] failure to give timely notice." Doc. 48, Pl.'s App. 246–49, Ex. M, Denial Letter. The Denial Letter again directed Defendants to the "prompt notice" requirement in the Policy and stated

- 6 -

that Defendants "failed to give notice of the damage to the Property until over two and a half years after the alleged hailstorm." *Id.* at 248. The Letter indicated that this "late notice has prejudiced Underwriters' ability to properly investigate the claim and pay only for damage that occurred during the policy period." *Id.* at 249.

B.    *Procedural History*

On the same day, February 18, 2016, Underwriters also filed its Original Complaint and Request for Declaratory Judgment, asking the Court to declare "that there is no coverage under [the Policy] for the reported hail damage because Defendants violated the policy's notice condition and Underwriters suffered prejudice as a result." Doc. 1, Pl.'s Original Compl. & Req. for Declaratory J. ¶ 21. Defendants later counterclaimed for declaratory judgment, breach of the insurance contract, and multiple violations of §§ 541 and 542 of the Texas Insurance Code. Doc. 11, Defs.' Answer & Countercls.[5]

Underwriters now moves for summary judgment on Defendants' breach of contract and

_____

[5]Underwriters subsequently requested and was granted leave to file an Amended Complaint incorporating additional allegations but no new causes of action (Doc. 20, Pl.'s Unopposed Mot. for Leave to File Am. Compl.; Doc. 21, Electronic Order Granting Mot. for Leave), which Plaintiff then filed on July 11, 2016. Confusingly, Plaintiff actually filed its Amended Complaint twice. *See* Docs. 22 and 23. These documents appear to be identical, so the Court considers the later-filed (Doc. 23) to be the operative pleading.

In another strange turn of events, Defendants never filed an updated answer in response to Plaintiff's Amended Complaint. Nor has Plaintiff, for that matter, ever filed an answer to Defendants' counterclaims. Thus, although both sides are technically in default, neither has raised the issue, and the parties appear to be proceeding with the understanding that Defendants' original Answer and Counterclaims (Doc. 11)—though filed in response to Plaintiff's Original Complaint (Doc. 1)—also serves as a responsive pleading to Plaintiff's later-filed Amended Complaint (Doc. 23). Therefore, so will the Court. *See Superior Edge, Inc. v. Monsanto Co.*, 44 F. Supp. 3d 890, 893 n.2 (D. Minn. 2014) (citing *Cartier v. Wells Fargo Bank, N.A.*, 547 F. App'x 800, 804 (8th Cir. 2013) ("Under these circumstances, we conclude the district court acted within its discretion to treat the motion to dismiss the original complaint as a motion to dismiss the amended complaint.")).

Texas Insurance Code counterclaims. Doc. 46, Pl.'s Am. Mot. Summ. J [hereinafter Pl.'s Mot.].[6] Defendants responded (Doc. 32), and Plaintiff replied (Doc. 43).[7] Therefore, Plaintiff's Motion is now ripe for review.

## II.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." *Burrell v. Dr. Pepper/Seven Up Bottling Grp.*, 482 F.3d 408, 411 (5th Cir. 2007). And a fact "is 'material' if its resolution could affect the outcome of the action." *Id.*

The summary judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). Usually, this requires the movant to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

---

[6] Plaintiff initially filed a motion for summary judgment on July 27, 2016 (Doc. 24), then asked to withdraw it the following day (Doc. 25), which the Court allowed (Doc. 26). Plaintiff later re-filed its motion for summary judgment in November 2016. Doc. 29. The following month, however, recognizing the Court's local rule requiring that a motion, brief, and appendix be filed as separate documents, Plaintiff requested leave to re-file its motion in accordance with that rule (Doc. 41), which the Court granted (Doc. 45). Plaintiff then filed the present Amended Motion for Summary Judgment (Doc. 46), Brief in Support (Doc. 47), and Appendix (Doc. 48) in December 2016, the only difference from the November 2016 filing being that the motion, brief, and appendix are now separate documents. Thus, although the Court acknowledges November 2, 2016, as the date of filing, all references in this opinion are to the Amended Motion (Doc. 46) and its attendant documents.

[7] Defendants later requested (Doc. 78), and were granted (Doc. 83), leave to file several supplemental documents in opposition to Plaintiff's motion for summary judgment.

(internal quotation marks omitted). But if the non-movant ultimately bears the burden of proof at trial, the movant may satisfy its burden just by pointing to the absence of evidence supporting the non-movant's case. *Id.* at 322–23.

If the movant meets that burden, then it falls to the non-movant to "show with significant probative evidence that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (internal quotation marks omitted) (citing *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)). And significant probative evidence is just that: significant. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam). "[M]etaphysical doubt as to material facts," "conclusory allegations," "unsubstantiated assertions," or a mere "scintilla of evidence" will not do. *Id.* (internal citations and quotation marks omitted). Rather, "the non-movant must go beyond the pleadings and present specific facts indicating a genuine issue for trial." *Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014) (citing *Celotex*, 477 U.S. at 324).

To be sure, the court views evidence in the light most favorable to the non-movant when determining whether a genuine issue exists. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). But it need not "sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)). Simply put, the non-movant must "identify specific evidence in the record" and "articulate the precise manner in which that evidence supports [its] claim." *Id.* If it cannot, then the court must grant summary judgment. *Little*, 37 F.3d at 1076.

## III.

## ANALYSIS

A.    *Defendants' Evidentiary Objections*

Before turning to the merits of Plaintiff's Motion, the Court must first address Defendants' objections to Plaintiff's summary judgment evidence. Defendants object to paragraphs 10, 11, 12, 13, and 16 of the affidavit of Derek Phipps, which is attached as Exhibit H to Plaintiff's Amended Motion for Summary Judgment. Doc. 35, Defs.' Objs. to Pl.'s Evid. in Supp. of Summ. J. [hereinafter Defs.' Objs.].

As noted above, Phipps was the independent adjuster sent by Frontier Adjusters—on behalf of Underwriters—to investigate the property a few weeks after the hail claim was filed. Doc. 34, Defs.' Resp. 5; Doc. 47, Pl.'s Br. 4. Plaintiff provided an affidavit from Phipps as part of its summary judgment evidence. *See* Doc. 48, Pl.'s App. 212–15, Ex. H, Aff. of Derek Phipps. The affidavit is dated July 25, 2016—roughly five months after the claim was denied and this lawsuit was filed—and it describes generally how Phipps's investigation was affected by the two and a half year gap between the time of the reported loss in June 2012 and the filing and investigation of the claim in December 2014 and January 2015. *Id.*

The entirety of the challenged portion of Phipps's affidavit states the following:

10. "The late notice of the claim impacted the investigation in the following ways:
    a. I was unable to inspect the insured property immediately after the loss.
    b. I was unable to document the condition of the roof immediately following the Loss.
    c. I was unable to determine if the roof or exterior elevations had been impacted by other weather events or other non-covered perils preceding the Loss.
    d. I lost the opportunity to quantify the damage present at the insured

premises immediately after the Loss.

e. I lost the opportunity to interview witnesses who may have known the prior condition of the roof and the impact of the Loss.

f. The condition of the roofs changed significantly between the time of the alleged hail storm and the date notice was finally given, making investigation of the existence and extent of the related damage nearly impossible."

11. "As a result of the late notice of the claim, the investigation was severely hindered."

12. "As a result of the late notice of the claim, I could not conduct a full and fair investigation of the circumstances surrounding the Loss in order to determine whether the damage resulted from a covered peril."

13. "Based on the Xactimate pricing, the late notice of the claim increased the estimated cost to repair the damage to the Property."

. . . .

16. "Based on the Xactimate pricing, the estimated cost to repair the damage to the Property increased during the thirty-month delay in the reporting of the claim. The cost to repair the damage to the Property would have been $47,802.67 less if the claim was reported immediately following the Loss."

*Id.* ¶¶ 10–13, 16.

Defendants' objections to these paragraphs fall into two categories. First, Defendants object to paragraphs 10, 11, and 12 because, Defendants argue, the statements are conclusory, fall within the realm of expert testimony, and conflict with Phipps's (later) deposition testimony. Doc. 35, Defs.' Objs. 2–5. Second, Defendants object to paragraphs 13 and 16 because, according to Defendants, "they mischaracterize facts in evidence." *Id.* at 5.

A lay witness's testimony is limited to that which is within his "personal knowledge of the matter," as required by Federal Rule of Evidence 602. Fed. R. Evid. 602. Lay witness opinion testimony is "limited to those opinions or inferences which are (a) rationally based on the perception

of the witness, (b) helpful to a clear understanding of the witness' [sic] testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *United States v. Cooks*, 589 F.3d 173, 179–80 (5th Cir. 2009) (citing Fed. R. Evid. 701). "[T]he distinction between lay and expert witness testimony is that expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008). Lay testimony, on the other hand, "must be the product of reasoning processes familiar to the average person in everyday life." *Cooks*, 589 F.3d at 180 (citing *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005)).

Looking first at the statements in paragraphs 10, 11, and 12, the Court disagrees with Defendants that the statements are conclusory or within the realm of expert testimony. With the exception of paragraph 10(f), the Court finds that the statements are merely facts within Phipps's personal knowledge or opinions rationally based upon his perception of the facts. For example, it is a temporal fact that Phipps "was unable to document the condition of the roof immediately following the loss," which necessarily impacted his ability to investigate the "circumstances surrounding the Loss." Doc. 48, Pl.'s App. 214, Ex. H., Aff. of Derek Phipps ¶¶ 10, 11, 12.

Turning to paragraph 10(f), however, the Court agrees with Defendants. Paragraph 10(f) states that the "condition of the roofs changed significantly between the time of the alleged hail storm and the date notice was finally given." *Id.* ¶ 10(f). But the rest of Phipps's affidavit belies his personal knowledge of the condition of the roofs at the time of the June 2012 hail storm. Because Phipps was unable to inspect the roofs immediately following the June 2012 storm, and because he is not designated as a roofing expert in this case, he cannot definitively state that these roofs

- 12 -

"changed significantly" during the time between the storm and his inspection. Therefore, Defendants' objection is **SUSTAINED** on this point and paragraph 10(f) is **STRICKEN** from the record.

As for Defendants' argument that the remainder of paragraphs 10, 11, and 12 conflicts with Phipps's deposition testimony, the Court is not convinced. The Court disagrees with Defendants that Phipps's affidavit conflicts with his later-given deposition testimony. Defendants argue that Phipps's affidavit stating that his investigation was impaired by the two-and-a-half-year lapse in time between the claimed date of loss and the filing and investigation of the insurance claim conflicts with his later-given deposition testimony that he was able to provide a complete estimate of the cost to replace the roofs in January 2015. Doc. 35, Defs.' Objs. 3–5.

Phipps's ability to provide an estimate of what it would cost to repair the damage he observed does not speak to whether this investigation was hampered in any way. *See Hamilton Props. v. Am. Ins. Co.*, No. 3:12-CV-5046-B, 2014 WL 3055801, at *10 (N.D. Tex. July 7, 2014) (noting that "the ability to conduct the investigation does not necessarily speak to the investigation's quality"), *aff'd*, 643 F. App'x 437 (5th Cir. 2016). Furthermore, the Court finds that Phipps's September 2016 deposition testimony is, in fact, quite consistent with his previous affidavit. *See, e.g.*, Doc. 33, Defs. App. 121–22, Ex. D, Dep. of Derek Phipps ("Q: Would it be fair to say that the more time passes after a hail event damages a property, the harder it is to tell when that damage occurred? A: That's fair to say. Q: Would it be fair to say that, if there are multiple hail events that caused damage to the property, the more time passes, the harder it would get to determine which damage was incurred on which date? A: I would agree with that.").

Turning to Defendants' objections to paragraphs 13 and 16, the Court disagrees that these paragraphs mischaracterize any facts in evidence. Defendants' objection centers on Phipps's use of the Xactimate computer program to compare the cost to replace the roofs in June 2012 versus the cost to replace them two and a half years later in January 2015. According to Plaintiff, Xactimate is a commonly used comprehensive software solution allowing insurance companies to estimate materials and labor prices for a specific time and place based on a constantly updated database of prices. Doc. 47, Pl.'s Br. 17; *see also* Doc. 34, Defs.' Resp. 10–11 (acknowledging that "Xactimate is typically used in the insurance industry to prepare estimates and provide the estimator with unit costs from a particular area of the state or country and for a particular time").

Phipps used Xactimate to prepare an estimate following his inspection in January 2015—using January 2015 pricing—which came to $472,028.08. Doc. 48, Pl.'s App. 214, Ex. H, Aff. of Derek Phipps ¶¶ 8–9. Phipps later ran the numbers again using June 2012 pricing, which produced an estimate of $424,225.41. *Id.* ¶ 15–16. So according to Phipps's calculations, if Defendants had reported the damage in June 2012 immediately after the storm that allegedly caused it instead of waiting until December 2014, then—assuming the loss was covered—the cost to repair the damage in June 2012 would have been $47,802.67 less based on materials and labor costs at that time. *Id.* ¶ 16. Thus, according to Phipps, "[b]ased on the Xactimate pricing, the late notice of the claim increased the estimated cost to repair the damage to the Property." *Id.* ¶ 13.

Defendants contend that "[t]he fact that the estimate prepared using the January 2015 pricing was higher than the estimate prepared using the June 2012 pricing does **not** prove that the late notice of claim increased the estimated cost to repair the damage to the Property, but rather

proves that Phipps could have utilized June 2012 pricing at any time during his investigation." Doc. 35, Defs.' Objs. 5. Put differently, Defendants argue that merely plugging different dates into a computer program does not demonstrate that the two-and-a-half-year delay resulted in prejudice to Plaintiff. But Defendants take no issue with Phipps's use of Xactimate generally to estimate repair costs. Rather, they object to the implications of his calculations. The affidavit merely states that Xactimate comes up with one number using June 2012 pricing and another number using January 2015 pricing. The Court fails to see how these statements regarding calculations performed by Phipps mischaracterize any facts in evidence.

In conclusion, Defendants' objections to Plaintiff's summary judgment evidence, namely paragraphs 10, 11, 12, 13, and 16 in the affidavit of Derek Phipps, are **OVERRULED** with the exception of paragraph 10(f), which the Court **STRIKES** from the record. The Court turns now to the merits of Plaintiff's Motion for Summary Judgment.

B.    *Plaintiff's Motion for Summary Judgment*

Underwriters moves for summary judgment on Defendants' counterclaims for breach of contract and violation of the Texas Insurance Code. The Court reviews each of Defendants' counterclaims in turn below.

1.    <u>Defendants' Breach of Contract Counterclaim</u>

Defendants contend that the damage to their property was the result of a hail storm that occurred during the policy period, and therefore Plaintiff breached the insurance contract when it denied Defendants' claim. Doc. 11, Defs. Answer & Countercls. ¶ 46.

Under Texas law, "[a]n insurance policy is a contract and is therefore subject to rules of

contract interpretation." *F.D.I.C. v. Firemen's Ins. C. of Newark, N.J.*, 109 F.3d 1084, 1087 (5th Cir. 1997) (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994)). "The elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance tendered by [Defendants]; (3) breach of the contract by [Underwriters]; and (4) damages to [Defendants] resulting from that breach." *Wright v. Christian & Smith*, 950 S.W.2d 411, 412 (Tex. App.—Houston [1st Dist.] 1997, no writ). Further, "Texas law clearly states that for an insurance company to be liable for a breach of its duty to satisfy a claim presented by its insured, the insured must prove that its claim falls within the insuring agreement of the policy." *Data Specialties, Inc. v. Transcontinental Ins. Co.*, 125 F.3d 909, 911 (5th Cir. 1997). And "[t]he insured bears the initial burden of showing that there is coverage . . . ." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 553 (5th Cir. 2004). That is to say that for Underwriters to be liable for breach of the insurance contract, Defendants must first prove that the claim was covered under the Policy.

Underwriters argues two grounds for summary judgment on Defendants' breach of contract counterclaim. First, Plaintiff argues that Defendants cannot prove that the claimed damage resulted from a covered peril because Defendants have provided no evidence segregating the damage attributable to the June 13, 2012 storm from damage attributable to the various other storms documented as occurring outside of the policy period in the years before and after the Policy was in effect. Doc. 46, Pl.'s Mot. 1–2. Second, Plaintiff contends that Defendants failed to comply with their duty under the Policy to provide prompt notice of the loss, which Plaintiff argues prejudiced its ability to investigate the claim and increased the cost to replace the roofs. *Id.* at 2. The Court considers the parties' arguments below.

*i. Covered loss*

"An insured cannot recover under an insurance policy unless facts are pleaded and proved showing that damages are covered by his policy." *Emp'rs Cas. Co. v. Block*, 744 S.W.2d 940, 944 (Tex. 1988), *overruled in part on other grounds by State Farm Fire & Cas. v. Gandy*, 925 S.W.2d 696 (Tex. 1996). To be sure, an insured who suffers damage from both covered and excluded perils is not precluded from recovering for the covered loss, but "[w]hen covered and excluded perils combine to cause an injury, the insured must present some evidence affording the jury a reasonable basis on which to allocate the damage." *Lyons v. Miller Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 601 (Tex. 1993). "[T]he burden of segregating the damage attributable solely to the covered event is a coverage issue for which the insured carries the burden of proof." *One Way Invs., Inc. v. Century Sur. Co.*, No. 3:14-CV-2839-D, 2016 WL 5122124, at *2 (N.D. Tex. Sept. 21, 2016) (citing *Wallis v. United Servs. Auto. Ass'n*, 2 S.W.3d 300, 303 (Tex. App.—San Antonio 1999, pet. denied)). And "[f]ailure to provide evidence upon which a jury or court can allocate damages between those that resulted from covered perils and those that did not is fatal to an insured party's claim." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Puget Plastics Corp.*, 735 F. Supp. 2d 650, 669 (S.D. Tex. 2010).

Here, Underwriters concedes that "the Policy covers damage by a windstorm or hail event which occurred during the Policy period – June 2, 2012 to June 2, 2013." Doc. 47, Pl.'s Br. 11. But it argues that Defendants have failed to provide any evidence either that the present damage is solely due to the June 13, 2012 storm or upon which a jury could reasonably allocate the present damage between the June 2012 storm and several documented hail events occurring outside the coverage period. *Id.* at 11–12. In support, Underwriters points to the fact that Defendants' own weather

history reports—provided first to Desai and then by Desai to the insurance agent—show eight hail events outside of the policy period that could have caused the damage. *Id.* Plaintiff also notes that Defendants didn't even select the date of loss for the insurance claim themselves; rather, the insurance agent selected the date after reviewing the weather reports and seeing that one hail event occurred during the policy period. *Id.* at 12.

Rather than pointing to evidence upon which a jury could reasonably allocate damages, Defendants instead focus on their contention that "all of [sic] damage was from the June 13, 2012 storm." Doc. 34, Defs.' Resp. 13. In support, Defendants contend that Underwriters "was in possession of at least three documents establishing June 13, 2012 as the date of loss when they made the decision to deny Defendants' claim." Doc. 34, Defs.' Resp. 2. The three documents Defendants reference are the damage estimate and related computer log notes of Derek Phipps and the first and second reports prepared by Haag Engineering. *Id.* As discussed below, however, neither these documents nor any other evidence submitted by Defendants raise a genuine issue of material fact as to whether the damage was entirely due to the June 13, 2012 storm or from which a jury could reasonably segregate the damages between storms.

Beginning with the Phipps Damage Estimate and related computer log notes, Defendants contend that Phipps "had no problem connecting the hail damage to the 2012 storm." Doc. 34, Defs.' Resp. 6. For support, Defendants point to the fact that Phipps's estimate lists "June 13, 2012" in the "Date of Loss" field, and a computer log note by Phipps on January 16, 2015, states that "[t]he roof materials are totaled by hail on the reported and documented DOL." *Id.* Contrary to Defendants' contention that Phipps tied the damage to the June 2012 storm, however, Phipps's

deposition is replete with testimony that he was not making any recommendations with regard to coverage, but instead was hired merely to investigate the extent of the damage and estimate the cost to repair or replace the roofs. *See, e.g.*, Doc. 33, Defs.' App. 44, Ex. D, Dep. of Derek Phipps ("Q: . . . . And you also made a recommendation to Frontier about coverage? A: No. Just documented the damage and made recommendations for repairs."); *id.* at 83 ("Q: And you made those recommendations from damage by hail as a result of the June 13th, 2012 storm; correct? A: Due to hail damage. Q: But specifically due to the June 13th, 2012 storm; correct? A: At that time I wasn't questioning the date of loss."); *id.* at 119 ("Q: And were you able to determine, during your inspection, when the hail damage was caused? A: That wasn't part of my inspection."); *id.* at 120 ("Q: So it was clear to you at the time that the damage that you saw was caused by hail? A: Yes. Q: And you just weren't sure when it was caused? A: Correct.").

As for the notation of "June 13, 2012" as the "Date of Loss" on the estimate and in the computer log notes, Phipps testified that he was merely repeating the date of loss provided to him. *Id.* at 81 ("A: I did reference the provided date of loss because I wasn't questioning that at the time."); *id.* at 102 ("Q: . . . . The only storm that you identified anywhere in your estimate, your notes, your reports was the June 13th, 2012 storm; true? A: That's the date of loss I used, yes. Just to be clear, I wasn't there to determine the date of loss."); *id.* at 124 ("Q: . . . . Just tell us what you meant by that note, please. A: I just meant that the hail -- date of loss that was reported, there was hail on that date."); *id.* ("A: I guess I was just reiterating that the -- the date of loss that they gave to me that we documented, that there was hail on that date.").

Far from establishing that Phipps attributed the damage solely to the June 13, 2012 storm,

the evidence merely demonstrates that there was hail damage observed at the property as of January 2015 and that weather history reports reviewed by Phipps as part of his inspection confirmed that a storm had occurred at the location on June 13, 2012, neither of which Plaintiff contests. Defendants' attempt to conjure a causation opinion out of Phipps's parroting the date of loss he'd received with his assignment is unconvincing. Thus, Phipps's estimate and log notes do little more than support a point that is not actually in dispute—that the June 13, 2012 storm *could have* caused the damage. "Whether the storm *actually did*—and to what extent—remains unclear." *Hamilton*, 2014 WL 30555801, at *5 (emphasis added).

Turning to the Haag reports, Defendants argue that "Haag concluded in their April 8, 2015 report (Report No. 1) that the hail damage to the hotel was from the June 13, 2012 storm." Doc. 34, Defs.' Resp. 7. What the first Haag report actually states is that the June 13, 2012 storm was "the *most recent* hailstorm with hailstones large enough to cause the damage." Doc. 33, Defs.' App. 250, Ex. G, Haag Report No. 1 (emphasis added). As mentioned above, Haag had also reviewed—and provided to Underwriters as an attachment to its first report—the same Weather Fusion/PointData weather history information showing four other hail events with estimated maximum hail size of greater than one inch at the property prior to the coverage period. *Id.* at 263–64.

As for the second Haag report, Defendants make much of the following statement: "We considered other sources of information and they helped us confirm June 13, 2012 as the *most likely* date damage occurred." Doc. 33, Defs.' App. 363, Ex. H, Haag Report No. 2 (emphasis added). This statement is unsurprising, however, considering the context of the second Haag report, which was specifically addressing "the likelihood that damage occurred between December 29, 2012 and

December 29, 2014," the two-year period prior to the date the claim was filed. *See id.* Significantly, a subsequent Haag report confirmed that "[t]here have been multiple hail events at this location." Doc. 33, Defs.' App. 372, Ex. I, Haag Report No. 3. This third report noted that "[h]ail as great as 1.50-inch diameter hail was reported on March 10, 2010, 4.25-inch diameter hail on May 24, 2011, 2.75-inch diameter hail on April 3, 2012 and 2.75-inch diameter hail on June 13, 2012." *Id.* at 371–72. All but the last are outside of the policy period.

Additionally, a letter from Haag Engineering dated August 11, 2016, clarifies that Haag Report No. 2 "inadvertently referred to June 13, 2012, as the 'most likely' date that damage occurred instead of the 'most recent,' as was concluded in [the] April 8, 2015, report." Doc. 33, Defs.' App. 402, Ex. J, Haag Report No. 4. The letter goes on to state that "it was never our intention to suggest that June 13, 2012, was the known date or the only date that dents/damage occurred at this property" and that "[m]eteorological study has been performed that identifies additional dates in [sic] which conditions were conducive to hail at the site prior to June 2012." *Id.* at 403. Plaintiff also provided an affidavit from Timothy Marshall, Principal Engineer and Meteorologist at Haag Engineering, dated May 20, 2016, reiterating that "hail greater than one inch in diameter likely fell at the Property on four dates: a) March 10, 2010, b) May 24, 2011, c) April 3, 2012, and d) June 13, 2012." Doc. 48, Pl.'s App. 245, Ex. L, Aff. of Timothy Marshall.

Defendants submitted several supplemental documents from Frontier Adjusters and Peninsula Insurance Bureau which Defendants argue demonstrate that "the damage to Defendants' property was caused by a hail storm on June 13, 2012" and that "Plaintiffs [sic] disregarded their own adjuster and expert when they wrongfully denied Defendants' claim." Doc. 78-1, Defs.' Mot. for

Leave to File Suppl. Record 2. According to Defendants, these documents show that Plaintiff "conducted a result-oriented investigation, first deciding they would not pay the claim and then seeking evidence to justify [its] position." *Id.* at 4. Thus, Defendants appear to infer from these letters and computer log notes between Frontier Adjusters and Peninsula Insurance Bureau regarding the progress of the claim that, because these third-parties took steps to investigate and estimate the claimed damage, they must have attributed the damage to the June 2012 storm, which Plaintiff then ignored.

First, the Court notes that whether an insurer ignores a third-party adjuster's recommendation regarding coverage is irrelevant to the inquiry of whether the damage is ultimately covered by the policy. For instance, an insurer may hire twenty adjusters that all tell it that the damage is covered. But if they all happen to be wrong, the damage is still not covered. Thus, the insurer could not be held liable for breach of the insurance contract for denying the claim. Such evidence would seem more relevant to a common law bad faith or statutory violation claim.

Second, far from establishing that the damage was due solely to the June 2012 storm, Defendants' supplemental documents actually support Plaintiff's position that it questioned the date of loss prior to denying the claim based on the lapse of time between the reported date of loss and the date the claim was filed. *See, e.g.*, Doc. 79, Defs.' Suppl. Records, Ex. B at 15 (computer log note dated June 11, 2015, from employee of Frontier Adjusters documenting Underwriters's request for additional investigation of "any hail storms" occurring "for two years prior to" the date of claim and inquiry into "[h]ow much damage would they have caused"). Thus, the Court finds that these documents bring Defendants no closer to establishing June 13, 2012, as the sole cause of damage,

or to providing a reasonable basis upon which a fact finder could segregate the damage between the June 2012 storm and other storms noted in the various weather reports in the record and in Underwriters's possession at the time the claim was denied.

In sum, Underwriters has provided competent summary judgment evidence that a non-covered peril—namely multiple hail events outside the coverage period—could have caused the damage. Therefore, "[Defendants] had the burden of establishing evidence to allow the jury to segregate covered losses from non-covered losses." *Atwill v. State Farm Lloyds*, No. 304CV1343-K, 2006 WL 1118155, at *2 (N.D. Tex. Apr. 27, 2006). But Defendants have provided no evidence of the condition of the roofs either immediately before or immediately after the June 2012 storm. "Federal courts applying Texas law have held that summary judgment is appropriate in cases where [parties] fail to raise a genuine issue regarding the amount of damage attributable to covered losses." *Clements v. State Farm Lloyds*, No. H-05-0923, 2006 WL 5157426, at *13 (S.D. Tex. July 25, 2006) (citing *Fiess v. State Farm Lloyds*, 392 F.3d 802, 807, 808 (5th Cir. 2004)); *Garza v. Allstate Tex. Lloyds*, No. Civ.A.M-04-270, 2005 WL 2388254, at *4 (S.D. Tex. Sept. 28, 2005) ("As [insurer] has provided some evidence that excluded perils caused the damage in question, and as [insured] has failed to set forth *any* evidence that would allow the trier of fact to segregate covered losses from uncovered losses, the Court GRANTS [insurer's] Motion for Summary Judgment as to [insured's] . . . claim.").

Because Defendants have failed to provide any evidence that would allow the trier of fact to segregate covered losses from non-covered losses, the Court concludes they have failed to raise a genuine issue of material fact on this point. As a result, Plaintiff is entitled to summary judgment on

Defendants' breach of contract counterclaim for this reason alone.

### ii. Prompt notice

Although the Court's conclusion above is dispositive of Defendants' breach of contract counterclaim, the Court nevertheless considers Underwriters's "prompt notice" argument for summary judgment as well. The Policy provides that in the event of loss or damage, Defendants must "[g]ive [Underwriters] prompt notice of the loss or damage." Doc. 48, Pl.'s App. 141, Ex. D, Building and Personal Property Coverage Form. Underwriters contends that Defendants failed to comply with this provision by not reporting the damage for over 30 months, which Underwriters argues prejudiced it in two ways: (1) by depriving it of the opportunity to fairly investigate the cause, nature, and extent of the loss closer in time to when it allegedly occurred; and (2) by increasing the cost to repair the damage. Doc. 47, Pl.'s Br. 1–2. Accordingly, Underwriters contends it was relieved of any obligation to perform under the Policy. *Id.* at 2. In other words, Underwriters argues it was not required to pay the claim because Defendants breached the "prompt notice" provision of the Policy.

Defendants, on the other hand, argue that "[t]he nature of the loss was such that it was not immediately discoverable" and that Defendants "reported the loss reasonably promptly after they learned about the damage" in November 2014. Doc. 34, Defs.' Resp. 2. Moreover, according to Defendants, "any delay on the part of Defendants in reporting the loss resulted in no prejudice to Certain Underwriters, or at the very least there is a genuine issue of material fact as to whether Certain Underwriters was prejudiced." *Id.*

As the parties appear to acknowledge, Texas has adopted a notice-prejudice rule when analyzing notice provisions in occurrence-based insurance policies like this one. *See PAJ, Inc. v.*

- 24 -

*Hanover Ins. Co.*, 243 S.W.3d 630, 634–35 (Tex. 2008); *see also Ridglea Estate Condo. Ass'n v.*
*Lexington Ins. Co.*, 415 F.3d 474, 479–80 (5th Cir. 2005). Accordingly, demonstrating the insured's
late notice of a claim alone is not enough to support an insurer's defense that the insured breached
the policy's notice requirement; rather, the insurer must also establish that it was prejudiced by such
delay. *See Ridglea*, 415 F.3d at 479–80. As explained below, the Court finds that Underwriters has
met both prongs.

<blockquote>a.    Unreasonable delay</blockquote>

The parties do not dispute the date of the alleged loss—June 13, 2012—or the date
Defendants first provided notice of the damage to Underwriters—December 29, 2014, the date of
the claim. They simply disagree on whether this delay of over two and a half years violates the
"prompt notice" requirement in the Policy.

The Policy does not define "prompt notice," but "Texas courts have held that where 'the
policy does not define the term "prompt," [courts] construe the term as meaning that notice must
be given *within a reasonable time* after the occurrence.'" *Ridglea Estate Condo. Ass'n v. Lexington Ins.*
*Co.*, 415 F.3d 474, 479 (5th Cir. 2005) (quoting *Stonewall Ins. Co. v. Modern Expl., Inc.*, 757 S.W.2d
432, 435 (Tex. App.—Dallas 1988, no writ)). And in cases with similar policy language to the
language here, the Supreme Court of Texas has held that property damage "occurs" when actual
physical damage to the property occurs. *See Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267
S.W.3d 20, 23–30 (Tex. 2008). Thus, in this case, the damage occurred on June 13, 2012, the date
of the storm that Defendants allege caused the actual physical damage to the property.

"While generally a question of fact, reasonableness becomes a question of law if the facts are

undisputed." *Alaniz v. Sirius Int'l Ins. Corp.*, 626 F. App'x 73, 76 (5th Cir. 2015). Other courts have held that similar periods of time were not prompt—*i.e.*, not reasonable—as a matter of law in cases involving hail damage. *See, e.g.*, *id.* at 76–78 (affirming district court finding that notice was not prompt as a matter of law where hail storm occurred in March 2012 but insured did not provide notice until February 2014); *Herrera v. State Farm Lloyds*, No. 5:15-cv-148, 2016 WL 1076911, at *3 (S.D. Tex. Mar. 18, 2016) (holding that almost two years between storm and notice was "unreasonable as a matter of law"); *Montemayor v. State Farm Lloyds*, No. 1:15-cv-173, 2016 WL 4921553, at *2–3 (S.D. Tex. Apr. 7, 2016) (finding two-year delay unreasonable as a matter of law); *Gayton v. Great Lakes Reinsurance (UK) PLC*, No. 7:14-CV-229, 2014 WL 12538129, at *3–4 (S.D. Tex. Aug. 11, 2014) ("Because the . . . delay of almost two years is totally unexplained and without excuse, the Court finds the delay unreasonable as a matter of law."); *Galvan v. Great Lakes Reinsurance PLC*, No. 7:14-CV-465, 2015 WL 12552009, at *2–3 (S.D. Tex. Apr. 15, 2015) ("While there is no bright line rule, the Court finds that waiting eighteen months to report a loss, especially when no excuse is proffered for the delay, is not 'prompt' as a matter of law."). And in a case with strikingly similar facts to those of this case, this Court has previously held that 19 months was not prompt as a matter of law. *Hamilton*, 2014 WL 3055801, at *8.

Defendants attempt to distinguish these cases from the present facts by arguing that the 30-month delay should be excused because Defendants "did not initially notice the damage" and because, according to Defendants, "[a] reasonable policyholder cannot report a loss that they could not have reasonably discovered yet." Doc. 34, Defs.' Resp. 16, 17. Defendants offer the following facts in support of their argument: (1) "the hail damage did not cause interior leaks to the hotel

which would have put Defendants on notice of the damage"; (2) "Defendants do not conduct routine inspection of the roofs because they can only be accessed by a crane or lift"; (3) "Defendants did not have a protocol to evaluate the hotel after hail storms"; and (4) "Defendants were not aware that the hail storm had been severe enough to cause any damage to the roof." *Id.* at 16. Indeed, Mr. Desai was apparently totally oblivious to the fact that a hail storm—which totaled the hotel's roofs—had even occurred. *See* Doc. 33, Defs.' App. 6, Ex. B, Aff. of Ajay Desai ¶ 4 ("I was not aware of the damage to the property caused by the June 13, 2012 hailstorm until November 2014. At the time of the storm in 2012, no guests reported damage to their vehicles or other property caused by hail. Likewise, none of my staff or employees reported any damage or water leaks to the hotel caused by hail. I am also not aware of any other businesses in the area that sustained damages from the storm."); *see also id.* at 28, Ex. C, Exam. Under Oath of Ajay Desai ("Q: Do you have any personal recollection of the hailstorm that occurred on -- supposedly occurred -- here in the area on June 13, 2012? A: No. Q: Don't remember it? A: Don't remember it."). In essence, Defendants argue their good faith and a sort of discovery rule should toll their "reasonable" time period for reporting the damage.

Overlooking Defendants' apparent lack of routine preventative maintenance protocols as to their roofs, as well as evidence that the damage was visible to the naked eye from the ground,[8] the

---

[8]Although Defendants contend they had "no reasonable way of knowing there was damage to the roof without someone getting up onto the roof with a lift or crane" (Doc. 34, Defs.' Resp. 16), Mr. Desai testified under oath that he first noticed in November 2014—coincidentally, while "evaluating the property for potential capital improvements" (*id.*)—that "[w]hen you drive up to the hotel, the shingles look really bad." Doc. 33, Defs.' App. 18, Ex. C, Exam. Under Oath of Ajay Desai. Defendants have not argued or provided any evidence that the damage from the June 2012 storm first manifested in November 2014. In fact, Defendants acknowledge that "the type of roof damage at issue is not the type which becomes more severe over time . . . ." Doc. 34, Defs.' Resp. 21. Desai also testified that he visited the property approximately once

Court notes that Texas law requires prompt notice "within a reasonable time after the *occurrence*," not within a reasonable time of discovery of the damage. *Ridglea*, 415 F.3d at 479 (emphasis added). "The date that the physical damage is or could have been discovered is irrelevant . . . ." *Don's Bldg. Supply*, 267 S.W.3d at 24; *Hamilton*, 2014 WL 3055801, at *8 (finding plaintiff's insistence that he gave notice "as soon as he reasonably realized that a covered claim may exist" insufficient). As established above, the damage "occurred" in this case, according to Defendants, on June 13, 2012. Thus, the Court has no problem finding that Defendants' notice—given over 30 months after the damage allegedly occurred—was not prompt as a matter of law. *See Hamilton*, 2014 WL 3055801, at *8. Having found that Defendants' notice of the claim was not prompt as a matter of law, the Court now considers whether Underwriters was prejudiced by the late notice.

### b.    Prejudice

As noted above, Underwriters must also show that it was prejudiced by Defendants' late notice. *See Ridglea*, 415 F.3d at 479–80. Underwriters relies primarily on the affidavit of Derek Phipps to demonstrate how it was prejudiced by Defendants' late notice of hail damage. First, Underwriters

---

a week. Doc. 33, Defs.' App. 18, Ex. C., Exam. Under Oath of Ajay Desai. Presumably, then, the "bad" roofs would have been visible to Mr. Desai every week when he drove up to the hotel between the date of the storm and November 2014.

Furthermore, as mentioned above, the damage is not only to the roofs but also to the hotel's siding. *See, e.g.*, Doc. 33, Defs.' App. 412, Ex. K, Phipps Computer Log Notes (noting that the "exterior EIFS has hail damage on each elevation requiring repairs and bids from two local stucco/eifs contractors"). And though Derek Phipps noted that distinguishing hail damage from other types of damage might require some level of expertise, he also testified that there was clearly damage to the hotel's siding which was visible from the ground. *Compare* Doc. 33, Defs.' App. 100, Ex. D, Dep. of Derek Phipps ("Q: Do you agree that, in order to determine damage to EIFS from hail, as opposed to some other type of loss or wear and tear, that you need some sort of experience or training? A: I think so. Q: It's not something that the average person is going to be able to identify; would you agree with that? A: Typically, yeah."), *with* Doc. 33, Defs.' App. 127–28 ("Q: . . . . With your naked eye, if you're walking at ground level, at this hotel, at this property . . . can you see damage to the EIFS siding? A: You can. Q: And do you need a ladder to see that? A: No. Q: Do you need a lift to see that? A: No. I found the damage as we were walking around it . . . .").

points to the ways Phipps's inspection was impacted, such as his inability to document the condition of the roofs until more than two years after the alleged date of loss or to determine how the roofs had been impacted by other weather events or non-covered perils such as wear and tear in the intervening time period. Doc. 47, Pl.'s Br. 15 (citing Doc. 48, Pl.'s App. 212–15, Ex. H, Aff. of Derek Phipps). Second, Underwriters argues that Defendants' late notice "also prejudiced Underwriters[ ] because the cost to repair the damage to the Property increased significantly during the thirty-month delay." *Id.* at 16. As evidence, Underwriters points to the calculations of Derek Phipps, described in Phipps's affidavit, using Xactimate to show that the estimate would have been $47,802.67 less if the claim was reported immediately following the loss so that Phipps could have used June 2012 pricing data rather than January 2015 pricing data. *Id.* at 17 (citing Doc. 48, Pl.'s App. 212–15, Ex. H, Aff. of Derek Phipps). Accordingly, Underwriters contends it was "relieved of any obligation to perform under the contract and [is] entitled to summary judgment on Defendants' breach of contract [counter]claim." Doc. 46, Pl.'s Mot. 2.

Defendants respond that "any delay on the part of Defendants in reporting the loss resulted in no prejudice to Certain Underwriters, or at the very least there is a genuine issue of material fact as to whether Certain Underwriters was prejudiced." Doc. 34, Defs.' Resp. 2. According to Defendants, while late notice may create an environment where prejudice can occur, Underwriters has failed to bridge the gap to demonstrate that it occurred in this case. *Id.* at 19 (citing *Trumble*, 304 F. App'x at 244). As discussed above, Defendants attempt to refute statements in Phipps's affidavit that he had difficulty investigating the damage with the fact that he was ultimately able to complete

an estimate of the cost to replace the damaged roofs. *See id.* at 19–20.[9] Thus, Defendants reason that because Phipps was able to provide an estimate of the cost to replace the damage he observed in January 2015 to Frontier Adjusters, who then passed the estimate along to Peninsula Insurance Bureau and ultimately to Underwriters, Phipps's investigation—and therefore Underwriters's investigation—must not have been prejudiced. Therefore, Defendants insist summary judgment is inappropriate.

"When an insurer must prove it was prejudiced by the insured's failure to comply with the notice provisions, 'the recognized purposes of the notice requirements form the boundaries of the insurer's argument that it was prejudiced; a showing of prejudice generally requires a showing that one of the recognized purposes has been impaired.'" *Blanton v. Vesta Lloyds Ins. Co.*, 185 S.W.3d 607, 612 (Tex. App.—Dallas 2006, no pet.) (quoting 13 Couch on Insurance § 186:14 (3d ed. 2005)). "The purpose of the notice requirement is to enable an insurer to promptly investigate the circumstances of an accident while the matter is still fresh in the minds of the witnesses, to prevent fraud, and to enable [the insurer] to form an intelligent estimate of its rights and liabilities under the policy so that it may adequately prepare to defend any claim that may arise." *Stonewall*, 757 S.W.2d at 435 (citing *Weaver v. Hartford Accident & Indem. Co.*, 570 S.W.2d 367, 369 (Tex. 1978); *Emp'rs Cas. Co. v. Glen Falls Ins. Co.*, 484 S.W.2d 570, 575 (Tex. 1972)). Thus, "prejudice from failure to notify timely arises from inability to investigate the circumstances of an occurrence and prepare adequately to adjust or defend any claims . . . ." *Blanton*, 185 S.W.3d at 615.

---

[9]Defendants also point to the letters and computer log notes between Frontier Adjusters and Peninsula Insurance Bureau mentioned above to argue that because the claim appeared to be moving along through the claims process, Underwriters was "able to conduct a full, fair and complete investigation of Defendants' loss." Doc. 78-1, Defs.' Mot. for Leave to File Suppl. Record 2.

But "an insurer must offer 'more than the mere fact that it cannot employ its normal procedures in investigating and evaluating the claim.'" *Trumble Steel Erectors, Inc. v. Moss*, 304 F. App'x 236, 244 (5th Cir. 2008) (per curiam) (quoting *Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 561 (3d Cir. 2001)). The insurer must show that it was prejudiced "in some tangible way." *Berkley Reg'l Ins. Co. v. Phila. Indem. Ins. Co.*, 690 F.3d 342, 349 (5th Cir. 2012). Though the existence of prejudice is generally a fact question, the Court may decide the issue on summary judgment "if the undisputed facts establish prejudice sufficient to relieve an insurer of its obligations." *St. Paul Guardian Ins. Co. v. Centrum G.S. Ltd.*, 383 F. Supp. 2d 891, 902 (N.D. Tex. 2003).

Other courts have held that an affidavit from an insurer listing the ways that an insured's failure to give prompt notice prejudiced the insurer "was sufficient to establish prejudice as a matter of law." *See, e.g., Camacho v. Allstate Texas Lloyds*, No. 7:14-CV-581, 2015 WL 12532486, at *3 (S.D. Tex. May 20, 2015) ("This Court has previously held that an affidavit from a claims manager for the defendant insurer listing the ways that the plaintiff's failure to give prompt notice prejudiced the insurer was sufficient to establish prejudice as a matter of law under the facts of that case."). The Court has already noted that the simple fact that an estimate of damages was "completed" says nothing of that investigation's quality. *See Hamilton*, 2014 WL 3055801, at *10. Instead, Phipps explains in both his affidavit and his deposition how his investigation was impacted. *See* Doc. 48, Pl.'s App. 212–15, Ex. H, Aff. of Derek Phipps; *see also* Doc. 33, Defs.' App. 131–33, Ex. D, Dep. of Derek Phipps. "[P]rejudice from failure to notify timely arises from the inability to investigate the circumstances of an occurrence to prepare *adequately* to adjust or defend any claim . . . ." *Blanton*,

185 S.W.3d at 615 (emphasis added). Thus, Defendants' attempt to twist the fact that Phipps was able to provide a damage estimate into an opinion that the damage he saw was due to the storm on the date of loss provided to him and that, therefore, he must have been able to complete a full and fair investigation is unpersuasive.

Yet even if the Court were to disregard Phipps's sworn testimony as to how his inspection was impacted by the delay, the Court would still find as a matter of law that the late notice resulted in tangible prejudice to Underwriters because the evidence shows that the cost to repair the damage increased by $47,802.67, or roughly ten percent, between June 2012 and January 2015. Underwriters provided evidence, utilizing the Xactimate estimating program, that if Defendants had reported the loss immediately after the June 2012 storm, the cost to repair the damage would have been $424,225.41 at that time. Doc. 47, Pl.'s Br. 17 (citing Doc. 48, Pl.'s App. 212–15, Ex. H, Aff. of Derek Phipps; *id.* at 250–257, Ex. N, Phipps Damage Estimate (June 2012 pricing)). But because Defendants reported the loss on December 29, 2014, the cost to complete the same repairs using January 2015 pricing was $472,028.08. *Id.* (citing Doc. 48, Pl.'s App. 212–15, Ex. H, Aff. of Derek Phipps; *id.* at 231–38, Ex. J, Phipps Damage Estimate (January 2015 pricing)).

As noted above, Defendants do not appear to take issue with Plaintiff's use of Xactimate in general or even the estimates it generated in this case specifically. Rather, Defendants argue that "[t]he fact that Phipps could have used the June 2012 Xactimate pricing at any point during the investigation, is actually proof that Certain Underwriters could have avoided any prejudice caused by the time delay." Doc. 34, Defs.' Resp. 21. Confusingly, Defendants appear to argue that because Underwriters has no evidence of how the condition of the roofs changed between the time of the

June 2012 storm and the time Defendants filed their claim—because Defendants did not report the damage for over two and a half years—that Underwriters cannot show that the cost to repair the damage increased during that time. On the contrary, the Court can imagine no better evidence of tangible prejudice than pricing data demonstrating that the cost to repair the damage increased during the period of delay, regardless of whether the condition of the roofs changed during that period.

Furthermore, Plaintiff would have had no reason to use the June 2012 pricing "at any point during the investigation" because there was not even an insurance claim until December 29, 2014. Therefore, construing the facts in the light most favorable to Defendants, the Court finds as a matter of law that Underwriters was prejudiced by Defendants' failure to provide prompt notice. Thus, Plaintiff is entitled to summary judgment on Defendants' breach of contract counterclaim on this ground as well.

2.    Defendants' Texas Insurance Code Counterclaims

The Court turns next to Defendants' counterclaims for violations of the Texas Insurance Code and Underwriters's motion for summary judgment thereupon. Defendants contend that Underwriters "violated several provisions of Texas Insurance Code § 541.060 by, among other things (1) conducting an unreasonable, untimely, and results-oriented investigation; (2) refusing to affirm or deny coverage within a reasonable time; and (3) attempting to coerce Defendants into accepting a grossly unfair and inadequate offer and signing a release." Doc. 34, Defs.' Resp. 29–30. Regarding their § 542 counterclaims, Defendants argue Underwriters "failed to timely acknowledge the claim, failed to conduct a reasonable and timely investigation, and refused to affirm or deny coverage within

a reasonable time in violation of Chapter 542 of the Texas Insurance Code, known as the Texas 'Prompt Payment of Claims Act' (PPCA)." *Id.* at 31.

Underwriters moved for summary judgment on each of these counterclaims, arguing that Defendants' Insurance Code claims necessarily fail because the breach of contract counterclaim fails and Defendants cannot show any independent injury outside of the claim for benefits under the Policy. Doc. 47, Pl.'s Br. 18–19. According to Underwriters, because the loss was not covered under the Policy, Defendants cannot recover for a statutory violation without injury independent of the policy benefits, which Defendants cannot, or at least have not, shown. For the reasons that follow, the Court agrees with Underwriters. Therefore, summary judgment in favor of Underwriters is warranted on Defendants' Texas Insurance Code counterclaims.

      i.    *Section 541*

Defendants contend that Underwriters breached § 541 of the Texas Insurance Code by "disregard[ing] all evidence in [its] possession which clearly established that Defendants' loss was a covered loss," by "delay[ing] communicating a coverage decision to the insured for almost 15 months," and by "attempting to coerce [Defendants] to settle the claim for an amount lower than the covered damages and to sign a complete release of liability by threatening to pursue a declaratory judgment action." Doc. 34, Defs.' Resp. 30, 31.

Section 541 prohibits an insurer from "failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of . . . a claim with respect to which the insurer's liability has become reasonably clear" or "refusing to pay a claim without conducting a reasonable investigation with respect to the claim." Tex. Ins. Code Ann. § 541.060(a)(2)(A), (7). Other prohibited conduct

includes failing to affirm or deny coverage or submit a reservation of rights to a policyholder within a reasonable time, or "undertaking to enforce a full and final release of a claim from a policyholder when only a partial payment has been made, unless the payment is a compromise settlement of a doubtful or disputed claim." *Id.* § 541.060(4), (6).

Liability under § 541 of the Texas Insurance Code is analyzed under the same standard as common-law bad faith claims. *See Hamilton Props. v. Am. Ins. Co.*, 643 F. App'x 437, 442 (5th Cir. 2016) (citing *Tex. Mut. Ins. Co. v. Sara Care Child Care Ctr., Inc.*, 324 S.W.3d 305, 317 (Tex. App.—El Paso 2010, pet. denied)). An insurer breaches its common law duty of good faith and fair dealing "if the insurer knew or should have known that it was reasonably clear that the claim was covered," but nevertheless denied or unreasonably delayed paying it. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 55–56 (Tex. 1997). "Evidence establishing only a bona fide coverage dispute does not demonstrate bad faith." *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998).

Generally, "there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered." *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995). An exception exists, however, when an insurer's conduct is "so extreme, that it would cause injury independent of the policy claim." *Id.* (citing *Aranda v. Ins. Co. of N. Am.*, 748 S.W.2d 210, 214 (Tex. 1988), *overruled on other grounds by Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430 (Tex. 2012)).

Underwriters argues that Defendants have neither alleged nor proven that they suffered any injury independent of the denial of policy benefits. Doc. 47, Pl.'s Br. 19. Therefore, according to Underwriters, because Defendants cannot prevail on their breach of contract counterclaim, they likewise cannot succeed on their extra-contractual claims under the Texas Insurance Code. *Id.* at

18–20. Defendants, for their part, argue that the confusing state of Texas law regarding whether "independent injury" is required when the only damages sought are unpaid coverage benefits necessitates that this Court hold off on deciding the motion for summary judgment until the Texas Supreme Court issues its opinion in *USAA Tex. Lloyds Co. v. Menchaca*, which addressed the exact question at issue here. Doc. 34, Defs.' Resp. 23.

Fortunately, the Texas Supreme Court delivered its opinion in *Menchaca* on April 7, 2017. *See USAA Tex. Lloyds Co. v. Menchaca*, No. 14-0721, 2017 WL 1311752 (Tex. Apr. 7, 2017). In *Menchaca*, the Supreme Court articulated the issue as follows:

> The primary question in this case is whether an insured can recover policy benefits as actual damages caused by an insurer's statutory violation absent a finding that the insured had a contractual right to the benefits under the insurance policy.

*Id.* at *4. After reaffirming the general rule that "an insured cannot recover policy benefits as damages for an insurer's statutory violation if the policy does not provide the insured a right to receive those benefits," the court went on to clarify the application of the "independent injury" rule. *Id.* According to *Menchaca*, "if an insurer's statutory violation causes an injury independent of the loss of policy benefits, the insured may recover damages for that injury even if the policy does not grant the insured a right to benefits." *Id.* Or stated in the negative, "an insured cannot recover *any* damages based on an insurer's statutory violation if the insured had no right to receive benefits under the policy and sustained no injury independent of a right to benefits." *Id.*

Here, the Court has already determined that Defendants have failed to raise a genuine issue of material fact on their counterclaim for breach of contract. In other words, Defendants have not demonstrated that the claimed damage was "covered" under the Policy. Or in the language of

*Menchaca*, they have not demonstrated a "right to receive benefits under the policy." *Id.* Therefore, Defendants' only route to damages for a statutory violation would be to demonstrate that they suffered an "injury independent of a right to benefits." *Id.*

Defendants have provided no evidence, and indeed do not even attempt to argue, that Underwriters's conduct was "so extreme" as to cause "injury independent of a right to benefits" under the Policy. *Stoker*, 903 S.W.2d at 341. Rather, Defendants argue that "the so-called 'independent injury' rule . . . simply does not apply to cases like this one . . . where the actual damages sought are coverage benefits due under the policy." Doc. 34, Defs.' Resp. 24. Thus, Defendants assume independent injury is not required in this case because they assume the claimed damages are covered.

Yet the Court has concluded that the claimed damages are not covered as a matter of law. So independent injury is required. And Defendants have failed to provide any evidence to raise a fact issue that the alleged statutory violations caused any injury independent of the policy benefits sought. *See Mid–Continent Cas. Ins. Co. v. Eland Energy, Inc.*, 709 F.3d 515, 521 (5th Cir. 2013) (observing that "in seventeen years since [*Stoker,*] no Texas court has yet held that recovery is available for an insurer's extreme act . . . ."). Therefore, without addressing whether the specific alleged conduct would constitute a violation of § 541, the Court finds that Underwriters is entitled to summary judgment on Defendants' § 541 counterclaims because Defendants cannot succeed on their breach of contract claim as a matter of law, and they have provided no evidence of injury independent of the policy benefits.

   *ii.*  *Section 542*

The Court next considers Defendants' counterclaim that Underwriters violated § 542 of the

Insurance Code. Defendants contend that, "[i]n addition to breaching the contract and failing to pay a covered claim in bad faith violation of Chapter 541, Certain Underwriters failed to timely acknowledge the claim, failed to conduct a reasonable and timely investigation, and refused to affirm or deny coverage within a reasonable time in violation of Chapter 542 of the Texas Insurance Code, known as the Texas 'Prompt Payment of Claims Act' (PPCA)." Doc. 34, Defs.' Resp. 31. Defendants argue that between the date of the Reservation of Rights Letter in March 2015 and the request for an Examination Under Oath of Desai in December 2015, Underwriters "inspected the property several times but never provided [Defendants] with any of the several reports and estimates Certain Underwriters obtained." *Id.* at 32. According to Defendants, "[a]ll evidence discovered during their investigation indicated that [Defendants'] loss was covered, but Certain Underwriters delayed making a coverage decision" and eventually "disregarded all evidence in their possession" and denied the claim. *Id.*

"The Prompt Payment of Claims Act prohibits insurers from delaying the payment of first-party claims." *Trammel Crow Residential Co. v. Va. Sur. Co.*, 643 F. Supp. 2d 844, 857 (N.D. Tex. 2008) (citing Tex. Ins. Code Ann. §§ 542.051–.061). It "establishes a series of claim-handling and claim-payment deadlines for insurers" and "provides additional damages when an insurer wrongfully refuses or delays payment of a claim." *Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 518 (5th Cir. 2015) (citing *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 16 (Tex. 2007)). "[T]o maintain a claim under Chapter 542 of the Texas Insurance Code, a party must show: (1) 'a "first-party" claim under an insurance policy'; (2) 'the insurer's liability for that claim'; and (3) 'the insurer's failure to follow one or more sections of the statute with respect to

handling that claim.'" *Johnson v. Safeco Ins. Co. of Ind.*, No. 3:15-CV-1939-B, 2017 WL 879211, at

*10 (N.D. Tex. Mar. 6, 2017) (citing *Hulcher Servs., Inc. v. Great Am. Ins. Co.*, No. 4:14-CV-231,

2015 WL 3921903, at *11 (E.D. Tex. June 25, 2015); *Weiser-Brown*, 801 F.3d at 518). In other

words, liability for the claim is a precondition to liability under Chapter 542. *Id.* (citing *Wellisch v.*

*United Servs. Auto. Ass'n*, 75 S.W.3d 53, 57 n.2 (Tex. App.—San Antonio 2002, pet. denied)).

Again without reaching the merits, the Court can quickly dispose of Defendants' Chapter 542

counterclaim. Here, the Court has already determined that Defendants cannot succeed on their

breach of contract counterclaim as a matter of law. Therefore, they cannot show that the insurer is

"liable for the claim," as is required to prove a violation of § 542. Accordingly, in light of the Court's

previous determination that Underwriters is not liable for Defendants' claim under the Policy,

Underwriters is entitled to summary judgment on Defendants' counterclaim for violation of § 542

of the Texas Insurance Code.

### 3.   Declaratory Judgment

This lawsuit originated as a declaratory judgment action by Underwriters, asking for

"judgment against Defendants declaring that there is no coverage under policy number

NJL440003612 for the reported hail damage because Defendants violated the policy's notice

condition and Underwriters suffered prejudice as a result." Doc. 1, Original Compl. & Req. for

Declaratory J. ¶ 21; *see also* Doc. 23, 1st Am. Original Compl. & Req. for Declaratory J. ¶ 22

(requesting same). In response, Defendants, in addition to filing the counterclaims for breach of

contract and violations of the Texas Insurance Code addressed above, requested a declaratory

judgment of their own: "that the Policy provides coverage for the cost to repair the damaged

property, less only a deductible, among other things." Doc. 11, Defs.' Answer & Countercls. ¶ 45.

Underwriters did not mention its request for, or Defendants' counterclaim, declaratory judgment in its motion for summary judgment. But "district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that [it] had to come forward with all of [its] evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).

The Fifth Circuit "has reversed summary judgment were a moving party's memorandum failed to raise a point 'in a manner that would be sufficient to put the [non-moving party] on notice that failure to present evidence of [the elements of each of its claims] could be grounds for summary judgment.'" *Tramago, L.P. v. Euler-Hermes Am. Credit Indem. Co.*, 602 F. App'x 981, 984 (5th Cir. 2015) (quoting *John Deere Co. v. Am. Nat'l Bank, Stafford*, 809 F.2d 1190, 1191 (5th Cir. 1987)). But that is not the case here.

The whole purpose of Underwriters's declaratory judgment action was to secure a finding that the Policy did not provide coverage for the claimed loss. Defendants, on the other hand, requested the opposite declaration—a finding of coverage. Because resolution of the parties' respective declaratory judgment claims amounts simply to a resolution of the coverage issue, the Court finds that Plaintiff's motion for summary judgment on Defendants' counterclaim for breach of contract was sufficient to put Defendants on notice that they needed to bring all of their evidence in support of their requested declaration of coverage. Thus, in holding above that Defendants cannot succeed as a matter of law on their breach of contract counterclaim, the Court has in effect declared "no coverage." Therefore, the Court finds that Defendants were "on notice that [they] had to come

forward with all of their evidence." *Thomas v. EMC Mortg. Corp.*, 499 F. App'x 337, 341 (5th Cir. 2012) (quoting *Celotex*, 477 U.S. at 326). For that reason, summary judgment in favor of Underwriters on the claims for declaratory relief is also warranted at this time.

## IV.

## CONCLUSION

For the reasons stated above, summary judgment is **GRANTED** in favor of Underwriters on Defendants' counterclaims for breach of the insurance contract and violations of the Texas Insurance Code, and these claims are **DISMISSED with prejudice**. Accordingly, the Court also **GRANTS** summary judgment *sua sponte* in favor Underwriters on its request for declaratory relief and **DENIES** *sua sponte* Defendants' request for declaratory relief.[10] An Order of Final Judgment will follow.

SO ORDERED.

SIGNED: July 21, 2017.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

---

[10]Because this order is dispositive of the case, Underwriters's Objections to Defendants' Expert Witness Disclosure (Doc. 58) is **OVERRULED as moot** at this time. Additionally, the parties' Joint Motion for Status Conference (Doc. 90) is also **DENIED as moot**.